UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-13191-GAO

TERRY E. TUCKER,
Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,
Defendant.

OPINION AND ORDER
September 28, 2016

O'TOOLE, D.J.

The Commissioner of the Social Security Administration denied Terry Tucker's application for a period of disability and disability insurance benefits. Before the Court are Tucker's Motion to Set Aside Order of Social Security Administration (dkt. no. 17) and the Commissioner's Motion to Affirm the Commissioner's Decision (dkt. no. 20).

## I.    Procedural History

Tucker applied for Social Security disability benefits in April 2012, claiming disability since December 2011. (Administrative Tr. 24 [hereinafter R.].)[1] His application was initially denied on July 31, 2012 and denied upon reconsideration on February 8, 2013. (Id. at 24.) Tucker requested a hearing, which was held before Administrative Law Judge ("ALJ") Stephen C. Fulton on November 21, 2013. (Id. at 43.) On January 28, 2014, the ALJ issued a decision concluding that Tucker was not disabled under the Social Security Act. (Id. at 24-38.) Tucker requested review

---

[1] The administrative record has been filed electronically (dkt. no. 11). In its original paper form, its pages are numbered in the lower right-hand corner of each page. Citations to the record in the Opinion and Order are to the pages as originally numbered and not to the numbering supplied by the electronic docket.

of the ALJ's decision by the Appeals Council on February 12, 2014. (Id. at 17-20.) On June 11,

2015, the Appeals Council denied his request for review. (Id. at 3-6.) This denial rendered the

ALJ's decision the final decision of the Commissioner and made the case ripe for review by this

Court under 42 U.S.C. § 405(g).

## II.  Background

Tucker graduated from high school and completed the equivalent of one year of college

courses. (Id. at 48.) Before the alleged onset of his disability, he worked as a telephone sales

representative who solicited business for regional oil companies. (Id. at 50.) In 1998, Tucker began

his own small business in the same field, using specially designed software that enabled

telemarketers to work from home. (Id. at 49-52, 79.) Tucker closed his business at the end of 2011

and has not worked since. (Id. at 52.) He claims he suffers from various physical and mental

impairments that limit his ability to work. (Id. at 52-53.) At the time of the ALJ's decision, Tucker

was 59 years old. (Id. at 48.)

### A.  Relevant Medical History

#### i.  South Shore Medical Center

On November 22, 2006, Tucker was evaluated at South Shore Medical Center for

management of hypertension and fibromyalgia. (Id. at 288.) Tucker reported symptoms of muscle

aches, weight gain, and fatigue. (Id.) He stated that his anti-depressant medication, Citalopram,

helped "a lot at first," but that he was unsure about its continuing efficacy. (Id.) Tucker also

reported that he was "sleeping well" with the aid of a CPAP machine and trying to walk two miles

per day. (Id.) Gregory Smith, M.D., noted that Tucker's hypertension was "in good control,"

ordered laboratory studies, and advised Tucker to improve his diet and exercise. (Id.)

On June 13, 2007, Tucker received routine treatment for sinusitis. (Id. at 281.) He was advised to manage his symptoms with Sudafed or Amoxicillin. (Id.)

On April 28, 2008, Tucker returned to the South Shore facility for another visit with Dr. Smith. (Id. at 281.) During this session, Tucker reported that he had not been taking blood pressure readings at home, despite having access to a cuff. (Id.)

On December 9, 2010, Tucker returned for management of hypertension and depression. (Id. at 321.) During the evaluation, Tucker reported that he felt well. (Id.) Dr. Marina Shtern noted that Tucker's blood pressure and depression were "stable," and advised him to continue with his current regimen of care. (Id. at 322.)

On June 28, 2012, Tucker returned to the South Shore facility, this time complaining of increased depression over the previous six months as a result of increased pain and financial difficulty. (Id. at 337.) He reported pain in his neck and left index finger, and paresthesia in all fingers of his left hand. (Id.) Dr. Shtern prescribed Wellbutrin to help manage Tucker's depression, and referred him to psychiatry for further management of his medication. (Id.)

> ii.   *Tucker's Function Report*

On April 27, 2012, Tucker completed a Social Security Administration Function Report describing the impact his impairments had on his day-to-day living.[2] (Id. at 184.) Tucker wrote that, on a good day, his routine included vacuuming, doing laundry, ironing, reading the newspaper, listening to the radio, and going for short walks. (Id. at 184, 186.) He noted that he could drive a car, pay bills, use a checkbook, and manage a savings account. (Id. at 187.) With respect to hobbies, Tucker wrote that his ability to ride his bike and take long walks had diminished

---

[2] The Social Security Administration asks disability claimants to fill out the Function Report (Form SSA-3373-BK) to help it make disability determinations. Claimants are instructed to complete the form themselves and to explain all answers in detail.

due to pain and lack of energy. (Id. at 188.) Socially, Tucker reported that he sat around the kitchen table and visited with friends several times each month. (Id.) Physically, he identified several bodily movements, including lifting, squatting, bending, standing, and reaching, that were negatively affected by his impairments. (Id. at 189.) He reported that his ability to handle stress and changes in routine was "average." (Id. at 190.)

### iii.   John Fahey

On June 1, 2012, John Fahey, Ph.D., performed a psychological evaluation of Tucker at the request of the Disability Determination Service. During the evaluation, Tucker reported a six year history of diffuse body pain centered in his neck, shoulders, and wrist. (Id. at 324.) He also complained that he was very easily fatigued and had difficulty remaining seated for any period of time. (Id.) Tucker told Fahey that a rheumatologist diagnosed him with fibromyalgia and that the rheumatologist continued to monitor his health. (Id.)

Tucker reported that he closed his marketing business in December 2011 because of a combination of pain and depression. (Id.) At the time of the examination, his daily routine included eating breakfast, dressing, watching television, and reading. (Id. at 325.) Tucker also stated that he would clean his house on occasion, but described cleaning as exhausting work. (Id.) He occasionally spent time with friends and neighbors, but he reported that his depression had caused a marked decline in his overall level of socialization. (Id.) Dr. Fahey noted that Tucker had no history of psychotherapy and that Tucker's affect was consistent with depression. (Id. at 325-26.) Tucker was assigned a Global Assessment Functioning ("GAF") score of 55.[3] (Id. at 324.)

---

[3] The GAF Scale is a single measure used to track global, clinical progress of individuals. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed. 2000). The GAF Scale ranges from 1 to 100. Id. A GAF score from 51–60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." Id. at 32.

According to Dr. Fahey's assessment, Tucker was likely to understand, and able to follow, directions. (Id. at 326.) Additionally, Tucker was capable of relating well with others. (Id.) Dr. Fahey opined that Tucker's depressed mood and weak concentration may diminish his follow through with certain complex tasks, but that his function might improve with psychotherapy. (Id.)

       iv.    *Kenneth Rood and Alfredo Chan*

On July 2, 2012, Tucker visited Kenneth Rood, LMHC, and Alfredo Chan, M.D., for a clinical evaluation. According to the examiners, Tucker exhibited depression, anxiousness, diminished energy, diminished concentration, diminished interest and pleasure, and persistent worries. (Id. at 355.) Tucker was assigned a Global Assessment Functioning ("GAF") score of 56. (Id. at 356.)

On August 20, 2012, Dr. Chan conducted a psychiatric evaluation of Tucker. He diagnosed Tucker with major depression and assigned a GAF score of 55. (Id. at 351.)

On October 29, 2012, Tucker returned for another examination with Mr. Rood and Dr. Chan. The examiners noted that Tucker was unable to engage in social situations and had difficulty remembering things, concentrating, and completing tasks. (Id. at 397.) They indicated that he required notes and numerous methods to remember when to complete tasks and that he had difficulty understanding directions regarding how to do new things. (Id.) They further noted that he had great difficulty with making decisions and following through; that he was withdrawn, tearful, and reluctant to go out socially; that he did not have company; that his punctuality and ability to take criticism were impaired; and that he became tearful and avoidant when he felt stressed. (Id. at 398.) They assigned Tucker a GAF score of 53. (Id.) Additionally, Mr. Rood and Dr. Chan opined that the examination by Dr. Fahey on June 1, 2012 was inconclusive because Dr.

Fahey did not perform any formal testing to assess Tucker's cognitive functioning, depression, or anxiety. (Id.)

> ### v.    JoAnne Coyle

On July 18, 2012, Tucker was examined by JoAnne Coyle, Ph.D., an advising psychologist to the Disability Determination Service. Dr. Coyle determined that, due to mental impairment, Tucker was mildly limited in his abilities to perform activities of daily living and to maintain social functioning, and moderately limited in his ability to maintain concentration, persistence, or pace. (Id. at 92.) She also noted that Tucker had experienced no episodes of decompensation. (Id.) Dr. Coyle opined that Tucker was capable of understanding and remembering routine instructions, sustaining attention and concentration for routine tasks, and maintaining effort for extended periods of time over the course of a normal work week within acceptable pace and persistence standards. (Id. at 95.) She concluded that Tucker was able to adapt to minor changes in routine with a moderately limited ability to respond appropriately to changes in the work setting. (Id. 95-96.)

> ### vi.    James Carpenter

Tucker's initial application for disability was denied shortly after his visit with Dr. Coyle. (Id. at 24.) Following the initial denial, he applied for reconsideration. (Id.) On November 21, 2012, Tucker was examined on reconsideration by James Carpenter, Ph.D., an advising psychologist to the Disability Determination Service. Dr. Carpenter's opinion mirrored that of Dr. Coyle. He determined that Tucker's mental impairment mildly limited his abilities to perform activities of daily living and to maintain social functioning. (Id. at 105.) He also determined that Tucker was moderately limited in his ability to maintain concentration, persistence, or pace, and that there had been no episodes of decompensation. (Id.) He noted that Tucker could understand

and remember routine instructions and sustain attention and concentration for routine tasks for extended periods of time over the course of a typical work week. (Id. at 106-07.) He also indicated that Tucker could adapt to minor changes in routine. (Id.) As to the nature and severity of the mental impairment, Dr. Carpenter opined that Tucker's account was generally credible, but that some statements were exaggerated and inconsistent with respect to the exact level of function. (Id. at 105.)

   *vii.*  *Mark Colb and M.A. Gopal*

  On July 6, 2012, Tucker was examined by Mark Colb, M.D., an advising physician to the Disability Determination Service. In his assessment of Tucker's residual functional capacity ("RFC"),[4] Dr. Colb noted that Tucker had "exertional limitations." (Id. at 93.) According to Colb, Tucker could occasionally lift and/or carry 50 pounds and could frequently lift and/or carry 25 pounds.[5] (Id.) He further noted that over the course of an eight-hour workday, Tucker could sit for six hours and could stand or walk for six hours. (Id.) According to Dr. Colb, Tucker could occasionally climb ramps or stairs; could occasionally climb ladders, ropes, or scaffolds; could occasionally stoop; could frequently balance; and could kneel, crouch, and crawl without limitation. (Id. at 94.) Ultimately, Colb opined that Tucker was not disabled. (Id. at 97.)

  On December 26, 2012, after Tucker applied for reconsideration, M.A. Gopal, M.D., an advising physician to the Disability Determination Service, concurred with Dr. Colb's assessment. (Id. at 104.)

---

[4] A claimant's RFC is "the most [he] can still do despite [his] limitations." 20 C.F.R § 404.1545(a)(1). Determining a claimant's RFC requires an assessment of his ability to meet the physical, mental, sensory, and other requirements of work. Id. § 404.1545(a)(4).

[5] "Occasionally" refers to a cumulative amount of time less than or equal to one-third of an eight-hour work day. (R. at 93.) "Frequently" refers to a cumulative amount of time between one-third and two-thirds of an eight-hour work day. (Id.)

*viii.    Jeanne T. Hubbuch*

On November 5, 2013, Tucker was evaluated by Jeanne T. Hubbuch, M.D. Dr. Hubbuch wrote a letter dated November 18, 2013, in which she detailed Tucker's complaints and his reported history of impairments. The letter noted physical symptoms such as body pain and fatigue, as well as mental symptoms such as short-term memory loss. (Id. at 423.) Dr. Hubbuch wrote that Tucker was "totally disabled from even part-time temporary work due to his constellation of symptoms and no improvement for two years without working." (Id. at 424.)

*ix.    Franchine Yencho*

On November 19, 2013, Franchine Yencho, a vocational consultant, evaluated Tucker's employability. Yencho's evaluation contained a description of Tucker's medical status as it was reported by Tucker, as well as references to Dr. Hubbuch's letter. (Id. at 426-29.) Yencho opined that Tucker's medical condition "rendered him vocationally, totally disabled from engaging in and maintaining any regular gainful employment activity for the foreseeable future." (Id. at 429.)

B.    Relevant Testimony

*i.    Tucker*

Tucker testified that he owned and operated a telemarketing company from 1998 until 2011. (Id. at 49.) His company solicited business for regional oil companies and used software that enabled telemarketers to work from home. (Id. at 49-50.) As part of his work, Tucker managed an "office-type setting," traveled across New England, met with oil company executives, and installed computer equipment. (Id. at 50.) According to Tucker, he was forced to close his business in 2011 due to his medical conditions. (Id. at 61.) These conditions, he asserted, prevented him from going on the road and making presentations. (Id. at 62.) As a result, "[t]he clients vanished and then [his] employees vanished." (Id.)

Tucker testified that he suffered from fatigue, depression, and fibromyalgia. (Id. at 53.) He stated that he was "completely exhausted" when he woke up in the morning and that he was unable to get refreshing sleep. (Id. at 54-55.) Tucker added that he was "depressed and tired all the time," and that he experienced overwhelming body weakness. (Id. at 58.) He noted that these issues began years before he closed his business, but that he fought to continue his work. (Id. at 61.)

Tucker also testified that he suffered from memory loss and that "it [was] difficult for [him] to remember any information that somebody might [give him]." (Id. at 55.) When asked how his cognitive problems would affect him in a work environment, Tucker replied that he had difficulty following instructions. (Id. at 58.) For example, he explained that "if somebody asked [him] to do something that [had] . . . three or four steps to it, then chances [were], [he was] going to mess it up." (Id.)

According to his testimony, Tucker's daily routine consisted of waking up, having breakfast, watching television, and listening to the news. (Id. at 61.) He stated that carpal tunnel syndrome prevented him from using a computer for more than twenty minutes and that he became uncomfortable if he remained seated or standing for more than fifteen or twenty minutes at a time. (Id. at 60, 66.) When asked about his ability to perform household chores, Tucker recalled that he used to cook, vacuum, do laundry, and landscape a small garden, but stated that he was no longer able to perform those tasks. (Id. at 72.) He testified that he had tried to engage in hobbies that he used to enjoy, such as riding a bicycle and swinging a golf club, but that those attempts resulted in "flare-up[s] of muscle pain and fatigue." (Id. at 73, 76.)

When asked about returning to the work force, Tucker replied that he could not perform any full-time job because of his medical conditions. (Id. at 52.)

ii.     *Vocational Expert's Testimony*

At Tucker's hearing, the ALJ questioned a vocational expert ("VE") about a hypothetical individual who: (1) shared Tucker's age, education, and work history; (2) could perform work at the light exertional level with occasional climbing and stooping; (3) could understand and remember simple instructions; (4) could concentrate on simple tasks for two-hour periods over an eight-hour work day; (5) could interact appropriately with coworkers and supervisors; and (6) could adapt to changes in the work setting. (Id. at 80.) The VE testified that such an individual could not perform Tucker's past relevant work because of the limitation on the complexity of instructions. (Id. at 81.) However, the VE stated that the individual could perform other work in the national economy. (Id.) For example, the individual could work as a parking cashier (3,314,810 national jobs and 71,680 local jobs), a photocopy machine operator (69,510 national jobs and 1,780 local jobs), or a fast food worker (3,314,010 national jobs and 57,590 local jobs). (Id. at 81-82.)

C.     The ALJ's Decision

The Social Security Administration employs a five-step sequential process for evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). The agency must determine (1) whether the claimant is performing substantial gainful work activity; (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments; (3) whether the claimant's impairment meets or medically equals an impairment listed under 20 C.F.R. Part 404, Subpart P, Appendix 1, and, if not, the extent to which the impairment impacts the claimant's RFC; (4) whether the claimant has the RFC to continue his past work; and (5) whether the claimant, given his RFC, age, education, and work experience, would be able to adjust to other work. Id. The claimant carries the burdens of production and proof throughout the first four steps. Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001). At step five, the burden shifts

to the Commissioner to prove there are specific jobs that exist in significant numbers in the national economy that the claimant could perform. Id.

The ALJ's opinion in this case followed the five-step sequential process. At step one, the ALJ concluded that Tucker had not engaged in substantial gainful activity since December 1, 2011, his alleged disability onset date. (R. at 26.)

At step two, the ALJ found that Tucker's only severe impairment was depression. The ALJ found that Tucker's claimed cervical osteoarthritis, chronic fatigue syndrome, carpal tunnel syndrome, fibromyalgia, hypertension, hyperlipidemia, obesity, and obstructive sleep apnea were non-severe. (Id.)

At step three, the ALJ found that Tucker's depression did not meet or medically equal the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 28.)

In assessing Tucker's RFC, the ALJ determined that he had mild limitations in performing activities of daily living and moderate difficulties maintaining concentration, persistence, or pace. (Id. at 29.) He found that Tucker could perform a full range of work at all exertional levels, with several nonexertional limitations: he could understand and remember simple instructions; concentrate on simple tasks for two-hour periods over an eight-hour day; interact appropriately with coworkers and supervisors; and adapt to changes in the work setting. (Id. at 30.)

At step four, the ALJ found that Tucker was not capable of performing his past relevant work. (Id. at 36.)

At step five, the ALJ adopted the VE's testimony and found that Tucker could perform other jobs in the national economy. The ALJ agreed with the VE that Tucker could work as a photocopy machine operator or fast food worker. (Id. at 37.) Based on the VE's testimony, the ALJ determined that both of these jobs existed in significant numbers in the national economy.

(Id.) Because the ALJ found that Tucker could perform other jobs that existed in significant numbers, he found that Tucker was not disabled between December 1, 2011 and the date of his decision. (Id. at 37.)

### III.   Standard of Review

Judicial review of the Commissioner's final decision is limited to determining whether the ALJ "used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). Upon review, an ALJ's findings as to any facts are conclusive "if [they are] supported by substantial evidence." 42 U.S.C. § 405(g); see also Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996). Substantial evidence exists where "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion." Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (citation and internal quotation marks omitted). If supported by substantial evidence, this Court must uphold the ALJ's determination "even if the record arguably could justify a different conclusion." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). When reviewing the record and assessing a claimant's testimony, the ALJ, not the Court, is responsible for deciding issues of credibility. Rodriguez v. Celebrezze, 349 F.2d 494, 496 (1st Cir. 1965).

### IV.   Discussion

On appeal, Tucker argues that the ALJ erred by: (1) improperly weighing medical evidence; (2) improperly assessing Tucker's credibility; (3) improperly determining that chronic fatigue syndrome was not a medically determinable impairment; (4) arbitrarily determining that Tucker did not suffer from a severe physical impairment, and then improperly ignoring the effects of Tucker's non-severe impairments in combination with depression; (4) improperly determining

that Tucker's depression was not disabling; (5) improperly questioning the VE and incorrectly determining that a significant number of jobs exists in the national economy that Tucker could perform; and (6) failing to consider Tucker's age as a vocational factor.

A.    Weight of Medical Evidence

Tucker first argues that the ALJ erred by improperly weighing certain medical evidence in the record. Specifically, he contends that the ALJ ignored the opinions of his primary care physicians and the vocational consultant who classified him as "disabled." When reviewing a disability determination, the ALJ must evaluate all medical opinions, regardless of their source. 20 C.F.R. § 404.1527(c). In deciding how heavily to weigh an opinion, the ALJ must consider the following six factors: (1) the examining relationship between the claimant and the source; (2) the treatment relationship between the claimant and the source; (3) evidentiary support for the opinion; (4) the opinion's consistency with the record as a whole; (5) the specialization of the source; and (6) any other factors the claimant raises. Id. § 404.1527(c).

Additionally, the regulations provide special rules for treating sources.[6] A treating source's opinion on the nature and severity of a claimant's impairment carries controlling weight if (1) it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) it is not inconsistent with the other substantial evidence in the case record. Id. § 404.1527(c)(2). If the ALJ determines that a treating source's opinion is not entitled to controlling weight, the ALJ must consider the six standard factors listed above. In addition to those factors, he must consider two

---

[6] A treating source is "[a claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. Nontreating sources include physicians and psychologists who have examined the claimant but have not had an ongoing treatment relationship. Id.

special factors: (1) the length of the treatment relationship and the frequency of examination, and (2) the nature and extent of the treatment relationship. Id. § 404.1527(c)(2)(i)-(ii).

As long as the ALJ's decision "makes clear that he considered the factors . . . [he is] not required to expressly mention each factor" when determining how much weight to afford each opinion. McNelley v. Colvin, No. 15-1871, 2016 WL 2941714, at *2 (1st Cir. Apr. 28, 2016).

The determination of whether a claimant meets the statutory definition of disability is an administrative finding reserved to the Commissioner and is not a "medical opinion." Id. § 404.1527(d). An ALJ may therefore determine that a claimant is able to work even if a medical source states that the claimant is "disabled." Id.

In this case, the ALJ assigned great weight to the opinions of Dr. Coyle, Dr. Carpenter, and Dr. Fahey. (R. at 34.) He gave less weight to the opinions of Dr. Hubbuch, Mr. Rood, Dr. Chan, and Ms. Yencho.[7] (Id. at 35.) Tucker asserts that these allocations were improper.

> ### i.  Drs. Coyle, Carpenter, and Fahey

The ALJ properly followed the regulatory requirements when he assigned greater weight to the opinions of Drs. Coyle, Carpenter, and Fahey. After analyzing the relevant evidence, he

---

[7] The ALJ also assigned little weight to the opinions of Dr. Colb and Dr. Gopal. (R. at 28.) He discounted their opinions because they classified obesity and fibromyalgia as exertional limitations without any identifying evidence to support that classification. (Id.) Despite their determination regarding Tucker's exertional limitations, these doctors ultimately concluded that he was not disabled. (Id. at 97.) Tucker contests that conclusion, and argues that these opinions should not be relied upon because they understate the severity of his limitations. Thus, the ALJ and Tucker agree that these opinions should be afforded little weight, although they arrive at that agreement for very different reasons. Given the lack of evidentiary support for the conclusion that fibromyalgia and obesity amounted to exertional limitations, the ALJ was justified in affording these opinions little weight. Even affording them great weight, the ALJ's conclusion that Tucker is not disabled would not have changed; Drs. Colb and Gopal agreed that the alleged exertional limitations did not rise to the level of disabling impairments.

determined that all three opinions were "consistent with the record as a whole." (Id. at 34.) There
is substantial evidence in the record to support this determination.

First, with regard to Tucker's mental capacity, all three doctors independently concluded
that Tucker could understand and follow directions and routine instructions. (Id. at 92, 106-07,
326.)  Second, with regard to Tucker's social abilities, Dr. Fahey concluded that Tucker was
capable of relating well with others, (id. at 326), while Drs. Coyle and Carpenter agreed he was
only mildly limited in his abilities to maintain social functioning. (Id. at 92, 105.) On three separate
occasions, Mr. Rood and Dr. Chan assigned GAF scores that indicated Tucker had just moderate
difficulty in social functioning. (Id. at 356, 351, 398.) Tucker himself reported in his self-
assessment that he maintained a social life by visiting with friends several times each month. (Id.
at 188.) Third, with regard to Tucker's daily routine, Dr. Fahey reported that Tucker could eat
breakfast, dress himself, watch television, and read, (id. at 325), while Drs. Coyle and Carpenter
agreed that he was only mildly limited in his ability to perform activities of daily living. (Id. at 92,
105.) Again, Tucker reported in his self-assessment that he performed chores around the house,
read the newspaper, listened to the radio, and went for short walks. (Id. at 184.) The ALJ's
determination that the opinions of Drs. Coyle, Carpenter, and Fahey were consistent with the
record was well-founded.[8]

---

[8] The ALJ's decision to afford greater weight to the opinions of Drs. Coyle, Carpenter, and Fahey
is further bolstered by these doctors' specializations and examining relationships with Tucker. The
record indicates that all three doctors were trained psychologists who specialized in evaluating
disability benefits claimants and had an opportunity to examine Tucker in person. (See id. at 90-
91, 104-05, 324-26.) Although the ALJ's decision reflects only his considerations of the
consistency with the record as a whole, he was not required to explicitly discuss all six factors.
McNelley, 2016 WL 2941714, at *2. The ALJ's explanations regarding his decision to afford less
weight to other opinions demonstrate his consideration of the relevant criteria throughout his
decision. See infra Part IV.A.ii-iv.

ii.     *Dr. Hubbuch*

The ALJ did not err when he afforded little weight to Dr. Hubbuch's opinion. The ALJ determined that Dr. Hubbuch's assessment was inconsistent with the record as a whole and inconsistent with Tucker's limited treatment history. (Id. at 35.) Dr. Hubbuch did not provide a function-by-function assessment of Tucker's work-related abilities and limitations. Although she concluded that Tucker was "disabled," she failed to support that conclusion with medically acceptable clinical and laboratory diagnostic techniques. Moreover, her determination that Tucker was disabled was not a "medical opinion" under § 404.1527(d) and was not dispositive as to the issue of disability; that determination is ultimately reserved for the Commissioner. In evaluating Dr. Hubbuch's opinion, the ALJ gave significance to the absence of a treatment relationship, inconsistencies with the medical record as a whole, and the absence of supporting explanations. (Id.) The ALJ's decision to give little weight to Dr. Hubbuch's opinion was based on the analysis required by § 404.1527 and was supported by substantial evidence.

iii.     *Mr. Rood and Dr. Chan*

Like Dr. Hubbuch's opinion, the joint assessment of Mr. Rood and Dr. Chan was entitled to little weight. Although they were a treating source, their opinion was entitled to little weight insofar as it indicated that Tucker could not engage in social situations or maintain attention and memory sufficient to perform simple work. The ALJ found this assessment to be inconsistent with other substantial evidence in the case record, including the GAF score of 53 assigned in their own opinion. (R. at 35.) That score was in line with the moderate limitations indicated by the record as a whole and reflected in the RFC the ALJ found.

Next, the ALJ considered the length of the treatment relationship and the frequency of examination. He determined that Mr. Rood and Dr. Chan had not treated Tucker enough to have

obtained a longitudinal picture of his impairment that would give their opinion more weight than that of a nontreating source under § 404.1527(c)(2)(i). (Id.) Indeed, the record contains notes and opinions from three visits that occurred within a span of just four months. [9] (Id. at 344, 349, 353.)

The ALJ then considered the nature and extent of the treatment relationship, including "the kinds and extent of examinations and testing the source . . . performed or ordered from specialists and independent laboratories." 20 C.F.R. § 404.1527(c)(2)(ii). As the ALJ noted, neither Mr. Rood nor Dr. Chan ordered or conducted formal tests, despite their criticism that Dr. Fahey's examination was invalid for its lack of such tests. Instead, the examiners appeared to base their assessment on subjective statements by Tucker. Because of the lack of evidentiary support, the inconsistencies with the record as a whole, and the condensed four-month treatment relationship, the ALJ's conclusion that Mr. Rood's and Dr. Chan's opinion was entitled to little weight was justified under § 404.1527.

  iv.    Ms. Yencho

The ALJ's decision to assign little weight to Ms. Yencho's opinion was also proper. Although Ms. Yencho is a vocational consultant, not an acceptable medical source under the relevant regulations,[10] the ALJ was required to consider her opinion. § 404.1527(c). In so doing, he determined that Ms. Yencho's statement regarding Tucker's "disability" was inconsistent with the record as a whole and inconsistent with Tucker's reported activities of daily living. (R. at 35.)

---

[9] Section 404.1527(c)(2)(i) does not specify an amount of time required to satisfy the length requirement ("Generally, the longer a treating source has treated you . . . the more weight we will give the source's medical opinion."). Though litigation surrounding this issue has been sparse, the ALJ's determination was reasonable in light of Polanco-Quinones v. Astrue, 477 F. App'x 745, 747 (1st Cir. 2012), which left open the possibility that a four-year treatment history could be insufficient to establish a longitudinal picture of an impairment.

[10] Acceptable medical sources are: (1) licensed physicians; (2) licensed or certified psychologists; (3) licensed optometrists; (4) licensed podiatrists; and (5) qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

Additionally, he found that the treatment history was "scant," as Ms. Yencho only met with Tucker on one occasion. (Id.)

The ALJ properly considered the factors enumerated in § 404.1527(c)-(d), including the treatment relationship and the opinion's consistency with the record as a whole. Since the determinative opinion regarding disability status is reserved to the Commissioner, Ms. Yencho's statement that Tucker was disabled was not a "medical opinion" under § 404.1527(d)(1). See Falcon-Cartagena v. Comm'r of Soc. Sec., 21 F. App'x 11, 14 (1st Cir. 2001).

The ALJ's decision to give little weight to the opinions of Dr. Hubbuch, Mr. Rood and Dr. Chan, and Ms. Yencho was supported by substantial evidence in the record. Accordingly, there was no error.

B.     Assessment of Tucker's Credibility

Tucker next argues that the ALJ erred in assessing his credibility when he found that Tucker's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely credible." (R. at 34.) Assessments of a claimant's credibility are the "prime responsibility" of the ALJ. Rodriguez, 349 F.2d at 496. Because the ALJ has the opportunity to observe the claimant, evaluate his demeanor, and consider how his testimony fits with the rest of the evidence, the ALJ's credibility determination is "entitled to deference, especially when supported by specific findings." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987). The ALJ has discretion to make an unfavorable credibility determination as long as he considers the claimant's subjective complaints and explains his reasons for rejecting them. Id.

Tucker's assertion that the ALJ improperly assessed his credibility is unpersuasive. The ALJ observed Tucker in person and concluded that, to the extent Tucker testified to limitations

greater than the ALJ found, Tucker's testimony was not credible. (R. at 35.) He supported this conclusion with several specific findings.

First, the ALJ found that the objective medical evidence of record was not consistent with Tucker's allegations regarding his mental and physical impairments. (Id.) With respect to the alleged mental impairments, he found that the record contained no evidence of psychiatric hospitalization, episodes of decompensation, or frank suicidal ideation. (Id.) He noted that Tucker had managed his symptoms with prescription medication, and that Tucker's GAF scores during treatment indicated only moderate mental limitations. (Id.) With respect to the alleged physical limitations, he found that Tucker had not undergone surgery or required long-term hospitalization. (Id.) He also noted that Tucker had received generally effective medical treatment from providers who monitored his medication and lifestyle. (Id.)

Second, the ALJ found that the record did not indicate any persistent complaints of side effects from medication or that medical providers saw a need to make any major changes in the type or dose of medication. (Id.)

Third, the ALJ found that Tucker reported a range of daily activities that were generally inconsistent with his allegations of disabling physical and mental impairments. (Id.) Specifically, he found that the record indicated Tucker was able to vacuum, do laundry, read the newspaper, listen to the radio, watch television, take occasional short walks, attend to personal care tasks, drive an automobile, handle household finances, visit with friends, and attend his medical appointments. (Id. at 35-36.) The ALJ acknowledged that Tucker reported a more restricted range of activities at certain points, but identified two factors that weighed against considering these reports as strong evidence of Tucker's disability. (Id. at 36.) First, the ALJ noted that Tucker's self-reported restrictions on daily activities could not be objectively verified with any reasonable degree of

certainty. (Id.) Second, he noted that the relatively weak medical evidence made it difficult to determine whether the claimed limitations, if real, were attributable to Tucker's medical condition. (Id.)

In sum, the ALJ considered Tucker's complaints and provided a detailed explanation, based on substantial evidence in the case record, as to why he made an unfavorable credibility determination.

### C.    Medical Determinability of Chronic Fatigue Syndrome

Tucker next argues that the ALJ should have found that chronic fatigue syndrome ("CFS") was a medically determinable impairment at the second step of the five-step sequential process. Although there are no diagnosing medical reports in the record that indicate Tucker suffered from CFS, Tucker asserts that when he was examined, no laboratory tests existed that could determine whether a patient was suffering from the syndrome.

Under the regulations in effect when the ALJ issued his decision, a claimant could establish the existence of CFS if the record contained "medical signs or laboratory findings" that supported the diagnosis. SSR 99-2p, 1999 WL 271569 (Apr. 30, 1999).[11] Under SSR 99-2p, CFS constitutes a medically determinable impairment if laboratory test results indicate: (1) an elevated antibody titer to Epstein-Barr virus capsid antigen equal to or greater than 1:5120, or early antigen equal to or greater than 1:640; (2) an abnormal magnetic resonance imaging brain scan; or (3) neutrally mediated hypotension as shown by tilt table testing or another clinically accepted form of testing. Id. Although "no specific etiology or pathology has yet been established for CFS," the

---

[11] This ruling was replaced by SSR 14-1p on April 3, 2014, after the ALJ wrote and issued his decision using SSR 99-2p. Tucker does not assert that SSR 14-1p should have applied to his case, but even if it did, his alleged CFS would not qualify as a medically determinable impairment. See infra note 12.

abovementioned test results could provide evidence of CFS as a medically determinable impairment for the purposes of disability judgments.[12] Id. As the ALJ correctly noted in his decision, the record contains none of the laboratory findings listed in SSR 99-2p. (R. at 27.)

Tucker insists, however, that under Rose v. Shalala, 34 F.3d 13 (1st Cir. 1994), the ALJ committed reversible error by requiring laboratory findings to support the diagnosis of CFS. But Tucker misconstrues Rose, which is plainly distinguishable from the matter at hand. In Rose, the ALJ determined that the claimant only had "possible" CFS despite multiple uncontradicted medical reports in the record that confirmed the diagnosis. Id. at 17-18. After the district court affirmed, the First Circuit vacated and remanded the district court's decision because "uniform

---

[12] Under SSR 99-2p, CFS can also be classified as a medically determinable impairment if one or more of the following medical signs are clinically documented over a period of at least six consecutive months: (1) palpably swollen or tender lymph nodes on physical examination; (2) nonexudative pharyngitis (sore throat); (3) persistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points; or (4) any other medical signs that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record. Here, the record contains evidence that Tucker exhibited swollen lymph nodes, mild pharyngeal erythema, and positive tender points at various stages of his treatment history. (Id. at 302, 335, 423.) However, none of these signs were documented over a period of six consecutive months. Tucker insists that there is no universally accepted test to determine if positive tender points are totally disabling, and argues that such a determination can only be made over the course of two to three consecutive days of examinations. However, he points to no evidence in the record that indicates such examinations occurred, and he does not argue that that the Social Security Administration should have ordered more tests.

The new ruling, SSR 14-1p, incorporates additional medical signs that can establish CFS as a medically determinable impairment, such as (1) frequent viral infections with prolonged recovery; (2) sinusitis; (3) ataxia; (4) extreme pallor; and (5) pronounced weight change. While the record indicates that Tucker received sporadic treatment for sinusitis, (see, e.g., R. at 281, 284, 302, 334), none of the medical reports indicate that the problem persisted for a period of six consecutive months as required by SSR 14-1p. During a doctor's visit on June 13, 2007, Tucker complained of sinus pain for the preceding ten days. (Id. at 284.) On April 28, 2008, he visited the doctor after one week of sinus pain. (Id. at 281.) The medical report from a December 26, 2011 visit does not specify the duration of the sinus pain, (id. at 302), but a report from a later visit on August 15, 2012 noted that Tucker had only been bothered by sinusitis for the preceding three weeks, (id. at 334.) While sinusitis appears to be a recurring issue for Tucker, the evidence on record would not have supported a diagnosis of CFS if SSR 14-1p had applied.

medical opinion require[d] a finding that the claimant suffer[ed] from CFS." Id. at 18. Contrary to Tucker's assertion, Rose does not prohibit ALJs from requiring laboratory findings to support a diagnosis. Rather, it prohibits them from substituting their own judgment for "uncontroverted medical opinion." Id. Here, Tucker's medical reports do not uniformly support a diagnosis of CFS. The ALJ therefore searched the record for laboratory findings or medical signs that could have satisfied the relevant regulations. He found none, and appropriately concluded that CFS did not qualify as a medically determinable impairment.

      D.     Severity of Physical Impairments

          *i.*     *Hypertension, Hyperlipidemia, and Obstructive Sleep Apnea*

Tucker argues that the ALJ arbitrarily found his hypertension, hyperlipidemia, and obstructive sleep apnea were not severe impairments within the meaning of the regulations. A "severe" impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

There is no indication from the medical evidence in the case record that either hypertension or hyperlipidemia has limited Tucker's ability to perform basic work. Although the record indicates that Tucker has been treated for both conditions, (see, e.g., R. at 288, 318, 321), nothing in the record suggested those conditions rose to the level of severity required by the regulations. Tucker did not reference hypertension or hyperlipidemia in his function report, nor did he testify about the effects of either impairment during his hearing in front of the ALJ. Tucker has provided no information as to why he believes either impairment prevents him from performing basic work, and no such information is evident in the record.

The ALJ also permissibly concluded that Tucker's sleep apnea, though well-documented in the record, also was not a severe impairment. Again, Tucker makes no specific argument as to

why his sleep apnea should be considered severe or which symptoms prevent him from performing basic work activities. The evidence does not provide a clear answer as to the efficacy of Tucker's sleep treatment, as the reports regarding the benefits of the CPAP machine have varied over time. Contrast id. at 288 ("Sleeping well on CPAP), with id. at 422 ("treated with C-pap [sic] without significant improvement"). In his hearing before the ALJ, Tucker testified that the machine was "doing its job" by preventing him from snoring and allowing him to breathe during his sleep. (Id. at 55.) He noted that despite the efficacy of the machine, he would wake up unrefreshed in the morning. (Id.) Later, he provided a possible alternative explanation for the lack of refreshing sleep and when he stated that he would "be woken up three or four times in the middle of the night" by numbness in his hands resulting from carpal tunnel syndrome. (Id. at 59.) On appeal, he has done nothing to identify sleep apnea as the specific cause of symptoms that prevent him from performing basic work. The ALJ's determination that sleep apnea did not qualify as a severe impairment was supported by the record.

### ii.    Obesity

Tucker next argues that the ALJ erred by failing to "give full credence to" his obesity. He does not identify a specific, substantive error in the ALJ's consideration of his obesity. Social Security Ruling 02-01p notes that obesity, alone or in combination with other impairments, "may" limit an individual's physical or mental ability to do basic work activities. See also Bledsoe v. Barnhart, 165 F. App'x 408, 412 (6th Cir. 2006). However, SSR 02-01p does not mandate "any particular procedural mode of analysis for obese disability claims." Id.

The ALJ in this case "considered the potential impact of obesity in causing or contributing to co-existing impairments," but determined that the record "contain[ed] no evidence of any specific or quantifiable impact on pulmonary, musculoskeletal, endocrine, or cardiac functioning."

(R. at 28.) Indeed, the record contains several reports which simply list obesity as an impairment without explaining its impact on Tucker's ability to perform basic work. (<u>Id.</u> at 91, 93, 104.) Tucker failed to identify any specific faults in the ALJ's treatment of his obesity, and the ALJ properly considered Tucker's obesity to the extent required by Social Security Rule 02-01p. As such, there was no error.

### iii.    Combination of Impairments

Tucker next argues that the ALJ failed to address the effects of Tucker's non-severe impairments in combination with depression. Even though the ALJ classified depression as a severe impairment, Tucker argues that he was forced to stop working because of the cumulative impact of his other impairments on top of his depression.

When conducting a disability determination, ALJs are required to consider physical and mental impairments, as well as the combination of such impairments, at the second step of the five-step sequential process. 20 C.F.R. § 404.1520(a)(4)(ii). In this evaluation, ALJs "shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be [severe]." 42 U.S.C. § 423(d)(2)(B).

Here, the ALJ did not ignore the combination of Tucker's impairments. First, he specifically wrote that he "[took] into account all allegations of symptoms arising from both severe and non-severe impairments in determining the claimant's residual functional capacity." (R. at 28.) Second, he included detailed notes on Tucker's treatment history, which included descriptions of Tucker's allegations regarding non-severe impairments such as hypertension, fibromyalgia, muscle aches, weight gain, fatigue, skin irritation, sinusitis, hyperlipidemia, back pain, and tinnitus. (<u>Id.</u> at 30-34.) The ALJ explicitly acknowledged his duty to consider the combination of

impairments and displayed his awareness of the possible impact of each impairment on Tucker's RFC throughout his opinion. (See id. at 25, 26, 27-28.)

    E.    Depression as a Disabling Impairment

Tucker next argues that the ALJ erred during the third step of the sequential process when he found that Tucker's depression did not meet one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Under the listings, a mental impairment may be classified as disabling if it results in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration.[13] 20 C.F.R. § Pt. 404, Subpt. P, App. 1. The ALJ determined that Tucker suffered only from mild limitations in performing activities of daily living and moderate difficulties maintaining concentration, persistence, or pace. (R. at 29.) Because depression did not result in two of the required criteria, Tucker was not classifiable as disabled under the listings. Tucker contends that his depression was more severe than the ALJ determined, and that it resulted in marked restriction in activities of daily living and marked difficulties with concentration, persistence, or pace.

The ALJ's determination that Tucker failed to demonstrate two of the required criteria was supported by substantial evidence. Medical opinions in the case record directly contradict Tucker's argument. Drs. Coyle and Carpenter both found that Tucker's mental impairment resulted in mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. at 92, 105.) Neither

---

[13] In addition to demonstrating two or more of these factors, the claimant must also provide medical documentation showing either persistent depressive syndrome, persistent manic syndrome, or bipolar syndrome. See 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Dr. Coyle nor Dr. Carpenter reported any evidence of repeated episodes of decompensation. (Id.) Additionally, Dr. Fahey opined that Tucker was "likely to understand directions," and that he was "capable of following directions." (Id. at 326.)

Furthermore, the ALJ supported his findings with specific details from the case record for each of the disputed criteria. With regard to daily living, he pointed to Tucker's reports that he could perform a variety of activities such as doing household chores, reading the newspaper, listening to the radio, and watching television. With regard to social functioning, he referenced Tucker's reported abilities to visit and spend time with family and friends, keep appointments he made, and get along with authority figures. With regard to concentration, persistence, and pace, he cited Tucker's reports that he could sustain concentration and attention for twenty to thirty minutes, finish tasks he started, and engage in activities like cleaning, reading, and driving that require some ability to sustain attention.

The ALJ properly determined that Tucker's mental impairment failed to satisfy the requirements under the listings.

F.      Vocational Expert Testimony

Tucker contends that the ALJ posed erroneous hypothetical questions to the VE that conflicted with the medical reports, treatments, and diagnoses of his treating physicians and the opinion of the vocational consultant who examined him. When questioning a VE during the fourth and fifth steps of the five-step process, "the ALJ must determine what evidence he credits in order to pose a hypothetical which will be relevant and helpful." Torres v. Sec'y of Health & Human Servs., 870 F.2d 742, 745 (1st Cir. 1989). If a claimant finds the questions posed to the VE inadequate, he can pose his own hypotheticals that he believes more accurately reflect his abilities in light of his impairments. Id. at 746.

Here, the ALJ's decision regarding the weight of each medical opinion was supported by substantial evidence. Supra Part IV.A. Tucker had an opportunity to examine the VE, but did not object to the phrasing of the hypotheticals. (R. at 84-85.) He asked only one question: whether any job existed in the national economy that Mr. Tucker could perform if the ALJ found Tucker "totally credible." (Id.) The VE answered that no such job existed. (Id. at 85.) However, the ALJ determined that Tucker was not entirely credible, and that determination was supported by substantial evidence in the record. Supra Part IV.B. Tucker's failure to pose different, more modulated questions at the hearing undercuts his argument that the hypotheticals were inadequate.

Tucker also disputes the ALJ's finding that a significant number of jobs that Tucker could perform exist in the national economy. Specifically, he argues that photocopy machine operator and fast food worker positions are unavailable to him, either because of his age or because they can be outsourced, computerized, or performed by robotics. Claimants are not entitled to disability benefits when there is a significant number of jobs in the region where the claimant lives, or in several other regions of the country, that have requirements that the claimant can meet with his physical or mental abilities and vocational qualifications. 20 C.F.R. § 404.1566(a)-(b). If a significant number of jobs exists, the claimant is not entitled to disability benefits regardless of (1) whether a specific job vacancy exists; (2) whether the claimant would be hired if he applied for work; or (3) whether he is able to obtain work. Id. § 404.1566(a), (c). ALJs may use VEs to help determine whether a claimant's "work skills can be used in other work and the specific occupations in which they can be used." Id. § 404.1566(e).

The ALJ's reliance on a VE is permitted by the relevant regulations and is common practice when determining the transferability of a claimant's skills to other occupations. The VE testified that someone with Tucker's RFC, age, educational background, and work history could work as a

photocopy machine operator (with 1,780 jobs in Massachusetts and 69,510 nationally) or as a fast food worker (with 57,590 jobs in Massachusetts and 3,314,010 nationally). (R. at 81-82.) Tucker asserts that the photocopying and fast food jobs do not exist in significant numbers, but provides no specific evidence to support his assertion. The mere contention that these jobs may be outsourced, computerized, or handled by robotic devices does not show how the VE's testimony was inaccurate. Neither does the suggestion that these jobs are unavailable to him because of his age. The ALJ clearly instructed the VE to consider "a person [who] is 59 years old" throughout the hypotheticals, (id.), and Tucker provides no evidence to suggest that the VE disregarded this instruction. Tucker has not demonstrated a lack of a significant number of jobs he could perform in either the local or national economy. Accordingly, there was no error.

G.      Age as a Vocational Factor

Tucker next argues that the ALJ erred by failing to consider his advanced age at the fifth step of the sequential process. At this step, the ALJ must consider vocational factors such as age, education, and work experience in determining whether an impairment prevents a claimant from adjusting to other work. 20 C.F.R. § 404.1520(g)(1). Special regulations exist for determining the transferability of skills for persons of advanced age (age 55 or older) and persons closely approaching retirement age (age 60 or older). See id. § 404.1568. Even with the special regulations, the disability status of a claimant in one of these age categories is not affected unless that person has a severe physical impairment that limits him to sedentary or light work. Id.

The age-specific regulations in § 404.1568 did not apply to Tucker's disability determination. Tucker was 57 years old when he stopped working and 59 years old at the time of his hearing before the ALJ. As a "person of advanced age" on the precipice of becoming a "person approaching retirement age," Tucker would have triggered the age-specific regulations only if he

suffered from a severe physical impairment that limited him to sedentary or light work. <u>Id.</u> However, the ALJ determined that Tucker's only severe impairment was depression and that Tucker had the RFC to perform a full range of work at all levels of exertion.[14] Accordingly, the cited regulations are inapplicable to Tucker's case.

**V.**       **Conclusion**

For the reasons stated herein, Tucker's Motion to Set Aside Order of Social Security Administration (dkt. no. 17) is DENIED and the Commissioner's Motion to Affirm the Commissioner's Decision (dkt. no. 20) is GRANTED. The ALJ's decision is AFFIRMED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

---

[14] The reports of Drs. Colb and Gopal suggested that Tucker was limited to performing work at the medium exertional level. (<u>See</u> R. at 93). Either way, the regulation does not apply because it is reserved for claimants who are limited to sedentary or light work. 20 C.F.R. § 404.1568.